**James R. WHYTE, Plaintiff
and Appellant,**

v.

**Brent A. BLAIR, Glen L. Taylor,
and American States Insurance,
Defendants and Appellees.**

No. 930555.

Supreme Court of Utah.

Nov. 2, 1994.

Brian S. King, Salt Lake City, for James Whyte.

Tim Dalton Dunn, Kevin D. Swenson, Salt Lake City, for American States Ins.

Michael J. Cooper, Salt Lake City, for Glen Taylor.

STEWART, Associate Chief Justice:

James R. Whyte appeals an order denying his motion for summary judgment and dismissing American States Insurance.[1] Whyte claimed that he was lawfully married to Linda Mitchell and therefore was "covered" under her auto insurance policy issued by American States Insurance as a member of her family, although their marriage was not solemnized.

On September 5, 1991, Whyte was injured when the car he was in, driven by Brent A. Blair, collided with a car driven by Glen L. Taylor. Blair was uninsured.

At the time of the accident, Whyte had been living with Linda Mitchell for three years. Mitchell had an uninsured motorist policy in the amount of $50,000 with American States Insurance that covered "family members." Mr. Whyte asserts that at the time of the accident, he was a family member by marriage to Ms. Mitchell. That marriage has never been solemnized. However, in compliance with Utah Code Ann. § 30–1–4.5 (1989), a marriage that is not solemnized may still be valid. Section 30–1–4.5 states:

(1) A marriage which is not solemnized according to this chapter shall be legal and valid if a court or administrative order establishes that it arises out of a contract between two consenting parties who:

(a) are capable of giving consent;

(b) are legally capable of entering a solemnized marriage under the provisions of this chapter;

(c) have cohabited;

(d) mutually assume marital rights, duties, and obligations; and

(e) who hold themselves out as and have acquired a uniform and general reputation as husband and wife.

(2) The determination or establishment of a marriage under this section must occur during the relationship described in Subsection (1), or within one year following the termination of that relationship. Evidence of a marriage recognizable under this section may be manifested in any form, and may be proved under the same general rules of evidence as facts in other cases.

---

1. Pursuant to a subsequent stipulation, the other parties were also dismissed, making the judgment final.

The district court ruled (1) that a marriage is not valid under Utah Code Ann. § 30-1-4.5 until a court or administrative order is entered, and (2) that there was not a sufficient showing of "good cause" to enter a *nunc pro tunc* order. Consequently, the court held that Mr. Whyte and Ms. Mitchell were not married at the time of the accident and Mr. Whyte was not covered by Ms. Mitchell's policy with American States Insurance.

■ Mr. Whyte argues that Utah Code Ann. § 30-1-4.5 does not preclude a court order establishing that he was married to Ms. Mitchell at the time of the accident and that there is no statutory requirement that he demonstrate "good cause" for such an order to be entered. We agree.

■ To frame the issue, we must make an important distinction. An order entered today may establish that a marriage was contracted and in existence sometime in the past. This is different from a *nunc pro tunc* order, which is entered by a court but by operation of law is treated as if it were legally entered at a prior time. Entry of a *nunc pro tunc* order ordinarily requires a showing of good cause. An order that simply adjudicates a prior judicial fact or status ordinarily requires no such showing. The issue is whether Utah Code Ann. § 30-1-4.5 permits an order to establish that a lawful marriage existed prior to the entry of the order. In essence, the issue is whether that provision establishes "common law marriage" as a lawful form of marriage.

Prior to 1987, Utah never recognized common law marriages; indeed, such marriages were expressly prohibited. Utah Code Ann. § 30-1-2(3) (1984) (repealed by § 30-1-4.5 (1987)); *In re Vetas' Estate*, 110 Utah 187, 190, 170 P.2d 183, 184 (1946); *see also Layton v. Layton*, 777 P.2d 504, 505 (Utah Ct. App.1989).

We begin with the plain language of the statute. *See Brinkerhoff v. Forsyth*, 779

P.2d 685, 686 (Utah 1989). Section 30-1-4.5 clearly directs that a court or administrative order may establish that a marriage was previously entered into and that it was lawful as of that time. Subsection (2) states that the court or administrative order must be entered "within one year following the termination of that relationship." An order that recognizes a marriage and is entered after the relationship has terminated must, by necessity, recognize that the marriage existed before the order was entered. Thus, the order merely recognizes that a woman and a man have by their prior consent and conduct entered into a marital relationship, although it was not theretofore formally solemnized or otherwise legally recognized. Section 30-1-4.5 declares that such a marriage is valid despite not having been solemnized. Thus, if the elements of § 30-1-4.5 subsections (1)(a) through (e) are established, then a lawful marriage may be found to have existed prior to the entry of the order by a court or administrative body. *State v. Johnson*, 856 P.2d 1064, 1069 (Utah 1993).[2]

The legislative history of section 30-1-4.5 clearly indicates that it is a codification of common law marriage principles. Office of Legislative Research & General Counsel, Summary S.B. 156 *Recognition of Common Law Marriages* (1987). The summary of Senate Bill 156 expressly refers to the bill as a common law marriage provision. It states, "Once a common law marriage has been found to exist by a court or administrative order, it is treated as any other marriage for all purposes."

Although the legislative summary does not expressly declare the reasons the Legislature adopted Utah Code Ann. § 30-1-4.5 and changed what had been basic Utah marriage law, the Legislature's purpose is clear: A marriage under the statute is valid from the time it is entered. If such a marriage were valid only from the time of the entry of a formal order, then that marriage would not

---

**2.** Defendants argue that *Walters v. Walters*, 812 P.2d 64 (Utah Ct.App.1991), *Layton v. Layton*, 777 P.2d 504 (Utah Ct.App.1989), and *Mattes v. Olearain*, 759 P.2d 1177 (Utah Ct.App.1988), are applicable. They are not. Each of those cases considered the validity of a common law mar-

riage in Utah prior to 1987. Because such marriages were prohibited prior to 1987, they were not valid. By contrast, in the present case the relationship that possibly establishes a common law marriage existed well after 1987.

differ from traditional marriages and the adoption of a common law form of marriage would serve no purpose. The only advantage of a common law marriage is to give formal recognition to marriages informally entered into in the past.

Under the common law and under state statutes like Utah's that adopt common law principles, the effect of a court order has always been to formally recognize a lawful marriage that began before the order was entered and existed from that time until terminated, most often upon the death of one spouse. *See, e.g., Travers v. Reinhardt*, 205 U.S. 423, 432, 27 S.Ct. 563, 565, 51 L.Ed. 865 (1907) (decedent's widow "was his lawful wife at the time of his death and ... had been his lawful wife for many years prior thereto"); *People v. Lucero*, 747 P.2d 660, 667 (Colo. 1987) (en banc); *Metropolitan Life Ins. Co. v. Johnson*, 103 Idaho 122, 645 P.2d 356, 362 (1982); *In re Estate of Hendrickson*, 248 Kan. 72, 805 P.2d 20, 25 (1991) ("a valid common-law marriage existed between" decedent and widow prior to his death and entry of the court order); *Hurley v. Hurley*, 222 Mont. 287, 721 P.2d 1279, 1284 (1986); *In re Estate of Murnion*, 212 Mont. 107, 686 P.2d 893, 900 (1984). Another example of the principle is found in *In re Estate of Eliasen*, 105 Idaho 234, 668 P.2d 110 (1983). There, a man and a woman consensually assumed marital obligations and habitation in 1967 without solemnization. Later, in 1970, they had a formal marriage ceremony. In a divorce decree, the court ruled that the marriage began in 1967, not in 1970. *Id.* at 114.

It follows that the *nunc pro tunc* statute, Utah Code Ann. § 30–4a–1, is inapplicable and Whyte need not show "good cause" for the court to enter an order recognizing his marriage, assuming that the statutory prerequisites are complied with.

 In determining whether a relationship satisfies the requirements of Utah Code Ann. § 30–1–4.5(1)(a) through (e), numerous factors should be considered. No single factor is .determinative. *See People v. Lucero*, 747 P.2d 660, 665 (Colo.1987) (en banc). Evidence of each element is essential. Consenting parties must show cohabitation, assumption of marital rights and duties, a general reputation as husband and wife, capacity to marry, and capacity to give consent. Often these five elements of section 30–1–4.5(1)(a) through (e) can be proved or disproved with relative ease. However, whether the parties consented to be married is often disputed. *See, e.g., State v. Johnson*, 856 P.2d 1064, 1069 (Utah 1993); *Lucero*, 747 P.2d at 665; *Hurley v. Hurley*, 222 Mont. 287, 721 P.2d 1279, 1284 (1986).

 The best evidence of marital consent is a written agreement, signed by both parties, manifesting their consent. *Metropolitan Life Ins. Co. v. Johnson*, 103 Idaho 122, 645 P.2d 356, 361 (1982). The testimony of others who were present when the agreement to assume all marital responsibilities was made could also be highly persuasive. *Travers v. Reinhardt*, 205 U.S. 423, 436, 27 S.Ct. 563, 567, 51 L.Ed. 865 (1907); *Metropolitan Life*, 645 P.2d at 361; *In re Estate of Murnion*, 212 Mont. 107, 686 P.2d 893, 908 (1984) (Haswell, C.J., dissenting). Despite the form of evidence used to show marital consent, what must be shown by the party claiming the benefit of an unsolemnized marriage is that at some point mutual consent was given.[3] This has at times been ex-

---

**3.** Although mutual consent is required, consent also may be established by acquiescence. In a divorce proceeding, the consent of the man to marry may be based on his objective words and actions that led the woman to believe that he had consented to marriage, despite later denying it. *In re Marriage of Winegard*, 257 N.W.2d 609, 616 (Iowa 1977). This is consistent with one purpose of section 30–1–4.5 to avoid "man in the house" welfare problems. Office of Legislative Research & General Counsel, Summary S.B. 156 *Recognition of Common Law Marriages* (1987).

In contrast, strong evidence of consent, such as (1) living together for 19 years, (2) having a child, (3) having a general reputation as married, and (4) having the mother of one of the partners living with them, was held insufficient to establish consent where the woman refused the man's marriage proposals on several occasions and some of their financial affairs were handled separately. *Maria v. Freitas*, 73 Haw. 266, 832 P.2d 259, 262 (1992).

In common law marriage cases, consent is the most frequently litigated issue. States vary widely in its treatment. Its development in Utah will necessarily proceed on a case-by-case basis.

pressed by the statement that a common law marriage must take place immediately or not at all, *Murnion*, 686 P.2d at 899, or alternatively, that a relationship illicit in its inception is presumed to be illicit throughout the period of cohabitation. *Id.* at 897.

Under the common law, the most customary proof of marital consent was general reputation, cohabitation, and acknowledgment. *Travers*, 205 U.S. at 437, 27 S.Ct. at 567; *Lucero*, 747 P.2d at 665. Under Utah's codification, evidence of general reputation, cohabitation, and assumption of marital rights and duties would be evidence of consent, but standing alone, would not be sufficient. *See In re Marriage of Winegard*, 257 N.W.2d 609, 616 (Iowa 1977) (cohabitation alone is insufficient). Section 30–1–4.5 requires general reputation, cohabitation, and assumption of marital obligations as separate elements in addition to consent. The following nonexhaustive list suggests probative evidence that has been used by other courts to establish consent: maintenance of joint banking and credit accounts; purchase and joint ownership of property; the use of the man's surname by the woman and/or the children of the union; the filing of joint tax returns; speaking of each other in the presence of third parties as being married; and declaring the relationship in documents executed by them while living together, such as deeds, wills, and other formal instruments. *Travers*, 205 U.S. at 441, 27 S.Ct. at 569; *Lucero*, 747 P.2d at 665; *Winegard*, 257 N.W.2d at 616.

Care must be given to guard against fraudulent marriage claims, *Lucero*, 747 P.2d at 664, especially where a declaration of marriage would reap financial rewards for an alleged spouse. When a reward is available, human nature may choose to strengthen and augment, in retrospect, the consent to marry that was only tentative before the reward became available. *Murnion*, 686 P.2d at 909 (Haswell, C.J., dissenting). Because a court or an administrative order will provide the same privileges to the parties to a marriage under the statute as the privileges under a formal marriage, the same duties must be imposed. A couple may not enter and exit a marriage for simple financial convenience. Where financial gain is at issue, acknowledgment of marital consent by the woman and the man may be less persuasive if contradictory evidence is presented. But if the acknowledgment is uncontradicted or if it does not benefit the man or the woman but rather some third party, then the acknowledgment may be more persuasive.

The district court's order is reversed, and the case is remanded to determine if a valid marriage existed prior to the accident.

ZIMMERMAN, C.J., and DURHAM and HOWE, JJ., and MICHAEL R. MURPHY, District Judge, concur.

RUSSON, J., having disqualified himself, does not participate herein; MURPHY, District Judge, sat.